UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CORNELL UNIVERSITY,

                            Plaintiff,

-against-

TOMPKINS-CORTLAND COUNTIES BUILDING
TRADES COUNCIL, MAINTENANCE DIVISION

                            Defendant.
_____

**COMPLAINT**

**Civil Case. No.:** 3:23-cv-1021 (DNH/ML)

Cornell University ("Cornell" or "the University") brings this action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. §§ 185 *et. seq.*, to vacate the Opinion and Award of Michael G. Whelan dated May 24, 2023 (the "Award") and annexed hereto as **Exhibit 1**. In support, the University alleges as follows:

### PARTIES

1.     Plaintiff Cornell University is, and at all times hereinafter mentioned was, a not-for profit, education corporation chartered by the State of New York (Laws of 1895, codified at New York Education Law Article 135) and having its principal office at Office of the President, 300 Day Hall, Cornell University, Ithaca, New York 14853.

2.     Defendant Tompkins-Cortland Counties Building Trades Council, Maintenance Division ("BTC" or "the Union") is the sole and exclusive bargaining representative of Local Nos. 241, 81, 277, 3NY, 178, 112, and 785 associated with the International Brotherhood of Electrical Workers, United Association of Plumbers and Steamfitters, North Atlantic States Regional Council of Carpenters, Bricklayers & Allied Craftworkers, IUPAT Painter District Council No. 4, SMART Twin Tier Sheet Metal Workers, and Laborers International Union of North America, respectively.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter under 28. U.S.C. § 1331 and 29 U.S.C. § 185.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 28 U.S.C § 185.

## NATURE OF PROCEEDING

5. Cornell brings this proceeding because the Award: (1) did not draw its essence from the terms of the parties' collective bargaining agreement effective July 1, 2021 through June 30, 2026 (the "CBA"); (2) exceeded the authority granted to the Arbitrator under the CBA, reflecting a manifest disregard of the law; and (3) violated public policy by, among other things, trampling over the property rights of both Cornell, as an easement grantor, and its instant easement grantee, while also purporting to override the labor relations and public bidding obligations of the instant easement grantee and all possible easement grantees in the future.

## FACTS

A. <u>The Collective Bargaining Agreement</u>

6. Cornell, as Employer, and BTC, as Union, are parties to the CBA, a copy of which is annexed hereto as **Exhibit 2**.

7. The University and Union have been parties to collective bargaining agreements for over 50 years, and the University has used union labor for the skilled trades since the 1930s.

8. The CBA recognizes the Union as exclusive bargaining representative for craft maintenance conducted by the University. The CBA provides that: "This Agreement shall be effective at Cornell University in Ithaca, New York, and shall include the University facilities in Tompkins County, New York, and cover craft maintenance performed at the University." CBA, Article 1 – Recognition.

9. The CBA has a management rights clause, that, *inter alia*, provides: "The parties agree that operation of the University including management and direction of its employees, and their work, is the exclusive right of the University. Certain functions, powers and responsibilities belong solely to the University, prominent among which, but not wholly inclusive are: . . . to terminate or divest itself of any part of the University operation, temporarily or permanently . . . . It is understood that all the functions, powers, and responsibilities of the University are retained except those expressly modified by an express provision of this Agreement." CBA, Article 30 – Management Rights.

10. The CBA contains a grievance procedure that provides, in part: "The jurisdictional authority of the arbitrator is defined and limited to the determination as to whether there have been violations of the provision or provisions of this Agreement as set forth in the written grievance. The arbitrator shall have the authority to issue an appropriate remedy which may include a monetary award. The arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement." CBA, Article 5 – Grievance Procedure.

11. The parties also set forth the types of grievances which are properly ripe for arbitration. Such grievances include where "the employer failed to apply terms of this agreement to any work defined as 'craft maintenance' under this agreement, by assigning work to non-union personnel . . . ." CBA, Article 5 – Grievance Procedure.

B. <u>NYSEG, a Non-Signatory to the CBA, Performs Work Within the Scope of its Property Rights Under a Permanent Easement</u>

12. In May 2022, the University granted a permanent easement to New York State Electric and Gas Corporation ("NYSEG") to install and construct a gas main. A copy of the easement is attached as **Exhibit 3**.

3

13. An easement is a property owner's grant of a real property interest to another party to use the property owner's land for that other party's purposes.

14. The ability to grant easements, and to generally acquire and dispose of real property interests, is an integral right of the University that has never been bargained away by the University.

15. The instrument granting to NYSEG, as Grantee, its easement stated in relevant part that the University, as Grantor, granted NYSEG:

> "a permanent easement and right of way, with the right, privilege and authority to install, construct, reconstruct, extend, operate, inspect, maintain, repair, replace, and at its pleasure, remove an underground gas pipeline, including hand/man holes, pipes, ducts and conduits, with the necessary fixtures or appurtenances thereto which the Grantee shall require now or from time to time for the underground transmission and/or distribution of natural and/or manufactured gas for the public or private use, in, under, and across said land and/or the highways abutting or running through said land."

16. NYSEG sought the easement due to its need to replace NYSEG's aging gas main along University and West Avenues. The NYSEG gas main not only serves University buildings but also forms part of a gas delivery network that services community utility needs beyond the University.

17. Exercising its easement rights, NYSEG thereafter constructed its own gas main within the easement, using its own NYSEG workers and NYSEG subcontractors.

18. NYSEG is not a party to the CBA between the University and the Union.

19. NYSEG has its own collective bargaining agreement with at least one other union that is not affiliated with the BTC.

20. NYSEG has its own obligations under federal labor laws to its own employees.

21. NYSEG selected the contractors for its gas main project.

22. The University had no role in selecting a contractor, hiring workers, or supervising or directing the work on NYSEG's gas main project.

23. Due to the University's total lack of involvement in NYSEG's work regarding NYSEG's own gas mains, the University is generally unaware of details concerning, for example, the scope of work, the workers to whom NYSEG assigned the work and the labor obligations attendant thereto, the hours worked by the workers selected by NYSEG, and tasks performed by those workers.

C. The Union's Grievance

24. The Union submitted a grievance on August 10, 2022, complaining about "non bargaining unit workers . . . performing Bargaining Unit Work on Campus." A copy of the Union's grievance is attached as **Exhibit 4**.

25. First, the Union claimed that the University had violated the following provision in Article 1 of the CBA: "All work associated with the demolition, repair, replacement, improvement to or construction of equipment, building, structures, utilities, and/or system or components thereof . . . Employer is free to assign such work; provided, however, such assignment does not fall within the craft performed by other employees covered by this agreement."

26. Second, the Union claimed that the University had violated the CBA provision in Article 30 which reserves to the University the power "to sub-contract, or to contract out, provided that, only with respect to work that falls within the jurisdiction of the craft unions covered by this agreement and that is performed within the geographical limitations of the job site, the University will sub-contract or contract out to sub-contractors or contractors who have agreements with craft union listed in Article 1, Recognition."

27. By its terms, the CBA covers only work assigned or contracted or subcontracted out by the University. It does not reference any work of third parties unaffiliated with the

University, much less such work occurring within the scope of property interests conveyed by the University.

28. The University did not "assign" work to be performed within NYSEG's use of its easement.

29. The University did not "contract" or "subcontract" work to be performed within NYSEG's easement.

30. The University lacked authority to assign, contract, or subcontract work to be performed within NYSEG's use of its easement.

31. At step 1 in the grievance process, the University denied the Union's grievance, finding that the CBA and its requirements apply only to work assigned by the University with respect to University facilities, and that they do not apply to independent entities operating on campus acting within their lawful rights.  The University concluded that under the terms of the permanent easement, NYSEG was free to work on the gas lines within the easement without consulting with the University as to how that work would be accomplished, including the use of non-BTC labor.  A copy of a written summary of grievance step 1 is attached as **Exhibit 5**.

32. The University and Union did not reach a mediated result at step 2 of the grievance process.

33. Michael G. Whelan was then appointed as arbitrator under the CBA.

34. A hearing was held before arbitrator Whelan on March 2, 2023.

35. The parties submitted post-hearing briefs on April 28, 2023.  A copy of the University's post-hearing brief is annexed as **Exhibit 6**, and a copy of the Union's post-hearing brief is annexed as **Exhibit 7**.

D.      The Challenged Arbitration Award

36.     On May 24, 2023, the arbitrator sustained the Union's grievance and concluded "that the University violated Article 1 of the CBA when it permitted NYSEG . . . to perform work pursuant to the Easement between the University and NYSEG in the summer of 2022" (Ex. 1, *Award*, p. 21).

37.     In addition, as a remedy, the arbitrator required that the University pay an unspecified amount of wages sufficient so that "affected members of the bargaining unit be made whole for lost wages as a result of the loss of work" (*id.*, p. 21). "To arrive at this determination" the arbitrator ordered the parties to "agree upon: (1) the crafts covered by the CBA involved in [NYSEG's] Pipeline Project; and (2) the number of hours worked by personnel in each craft by position (i.e., journeypersons, apprentices)" (*id.*).

38.     Further, the arbitrator ordered the University to "cease and desist from entering into any further easements that authorize non-union contractors to perform bargaining unit work within the exclusive jurisdiction of the Union" (*id.*, p. 22).

E.      The Arbitrator's Award Imposed a Term That Was Previously Rejected

39.     The University has a long history of regularly granting easements, including to municipalities and utility companies, averaging once or twice per year.

40.     At the arbitration, the Union presented no evidence regarding any historical performance of work within easements granted by the University to third parties.

41.     To the contrary, the evidence presented showed that on at least two prior occasions, in 2011 and in 2015, the University had rejected an interpretation of earlier iterations of the CBA which would extend the CBA's exclusivity clause to work performed by third parties within the scope of property interests granted by easements. On both occasions, the Union acquiesced and abandoned contrary claims.

42. In 2011, the then Union president, David Marsh, and the University's then Director of Labor Relations, Alan Mittman, corresponded regarding work performed by Verizon on the University's campus. This correspondence was submitted to the arbitrator as an exhibit at the hearing and is annexed hereto as **Exhibit 8**. The Union had inquired regarding "Verizon building forms and pouring cement around their conduit at the retaining walls near the Johnson Museum and construction work along Univ. Ave." The University responded and explained that "Verizon was moving their cables and installing them in a new duct bank" and that "NYSEG and Verizon do all the work on their assets." The Union did not file a grievance, request additional information, or question Mr. Mittman's statement that the work done by an independent easement holder within its easement on its own work is not work subject to the CBA.

43. In 2015, the Union filed a grievance concerning work being performed by non-union contractor Bellasario Construction. The documents concerning this 2015 incident were submitted to the arbitrator and are annexed hereto as **Exhibit 9**. The University responded to the Union, stating that "we have looked into this report and found that the work was being done by Bellasario directly for NYSEG and thus Bellasario is not working for Cornell in this project." In response, the Union asked for additional clarification. The University responded, explaining that NYSEG was performing work related to the repair of one of its gas pipelines, and that "NYSEG, of course is not subject to our CBA when working in their rights-of-ways." The Union thanked the University for its explanation and abandoned its grievance. As in 2011, the Union did not object to the University's explanation that work done by an independent grantee in its easement is not work subject to the CBA between the University and the Union.

44. Both of the aforementioned incidents occurred prior to the parties entering into the current CBA, which was negotiated in summer 2021.

45. Having engaged about this precise issue, and the University having rejected the Union's position, and the Union having acquiesced, the parties did not make any modifications to the language of the CBA purporting to bind easement holders or otherwise expanding the CBA's terms to work done by third parties within easement areas under the control of third parties.

46. In short, during the history leading up to the execution of the CBA, the University had already expressly disclaimed the obligation now forced upon it by the Award.

47. Until this case, the Union had not followed through with any challenge to the University's disclaimer, whether through the grievance process or through bargaining.

F.      Grounds for Vacatur

48. The Award must be vacated for multiple independent reasons.

49. In sustaining the Union's grievance, the arbitrator ignored the unambiguous terms of the CBA, which cover only work performed, assigned, contracted, or sub-contracted by the University, not work performed by independent entities performing their own work within their own property interests.

50. The Award improperly modifies the CBA to impose an obligation which was already expressly rejected by the University prior to entering into the CBA.

51. Under the Award, the University is prohibited from granting future easements that do not bind the grantee to the CBA's exclusivity clause, even for the grantee's own work (for which the grantee may have its own collectively bargained obligations to its own union(s)).

52. This Award significantly infringes upon the University's rights to freely alienate its real property, even though the CBA makes clear that such fundamental rights to dispose of real property were expressly reserved to the University. Nothing within the CBA even remotely suggests that the University intended to bargain away such rights.

53. By interpreting the CBA as restricting the University's right to transfer its real property interests, the arbitrator disregarded the requirement that he strictly construe contractual provisions to avoid restricting free alienation and use of real property.

54. In sustaining the Union's grievance, the arbitrator exceeded the authority granted to him by the CBA because he improperly added to, subtracted from, and/or modified the CBA's terms—something the CBA expressly prohibited him from doing (Ex. 2, Article 5).

55. The Award exceeds the arbitrator's jurisdiction insofar as it imposes injunctive relief aimed at non-signatories to the CBA, including NYSEG and any other future easement holders. The Award tries to impose upon non-signatory easement holders downstream obligations to hire Union craft workers, despite the possibility that doing so may require a non-signatory easement holder to be unable to fulfill its own collective bargaining obligations to its own union(s).

56. As a result, the Award conflicts with federal labor laws, which protect the rights of employees to bargain with their employers and reach binding terms through collective bargaining. Easement holders such as NYSEG are often employers themselves, and are separately accountable to their own employees with respect to performance of certain work. The Award purports to prohibit easements that would allow the easement-holder/employer to comply with its statutory, bargaining, and bargained-for contractual obligations to its own employees.

57. The Award also conflicts with mandatory competitive bidding requirements that are applicable to municipal easement holders, who may not require bidders for public works contracts to use union labor in the absence of project-specific findings that such requirements would lead to cost savings.

58. The damages portion of the Award also exceeds the scope of the arbitrator's authority because there was no evidence that any BTC workers suffered a loss of work due to the

granting of the easement. Had the University not granted NYSEG an easement, the work in question would not have been performed.

59. At the very least, the Award should be modified to eliminate ambiguity and afford complete relief within the scope of the CBA, including with respect to damages calculations and injunctive effects in light of the necessary involvement of non-signatories to the CBA.

## FIRST CAUSE OF ACTION
### LMRA § 301 – Award Does Not Draw Its Essence From CBA

60. The University repeats, realleges and incorporates by reference the allegations contained in the paragraphs above.

61. For the reasons set forth above, the Award is inconsistent with, and fails to draw its essence from, the terms of the CBA.

## SECOND CAUSE OF ACTION
### LMRA § 301 – Award Exceeds the Arbitrator's Authority

62. The University repeats, realleges and incorporates by reference the allegations contained in the paragraphs above.

63. For the reasons set forth above, the Award exceeds the authority granted to the Arbitrator under the CBA and reflects a manifest disregard of the law.

## THIRD CAUSE OF ACTION
### LMRA § 301 – Award Violates Public Policy

64. The University repeats, realleges and incorporates by reference the allegations contained in the paragraphs above.

65. For the reasons set forth above, the Award violates public policy.

**WHEREFORE**, Plaintiff Cornell respectfully requests an Order:

a. Vacating the May 24, 2023 Award of Arbitrator Michael G. Whelan in its entirety; or, in the alternative

b. Modifying the Award to cure the issues raised on this challenge; or, in the alternative

c. Remanding the Award for clarification; and

d. Granting such other and further relief as this Court may deem just, equitable, and proper.

Dated: August 21, 2023
       Pittsford, New York

HARRIS BEACH PLLC

*signature*

Kelly S. Foss
Svetlana K. Ivy
Thomas P. Smith
Daniel S. Galan
*Attorneys for Plaintiff*
99 Garnsey Road
Pittsford, NY 14534
(585) 419-8800
kfoss@harrisbeach.com
sivy@harrisbeach.com
tsmith@harrisbeach.com
dgalan@harrisbeach.com

12