# EXHIBIT 1
# (May 24, 2023 Opinion & Award)

## FEDERAL MEDIATION AND CONCILIATION SERVICE

Tompkins-Cortland Building & Construction
Trades Council,

                    Union,

and                                            Case No. 231025-00637

Cornell University,

                    Employer.

### **Opinion and Award**

Arbitrator Michael G. Whelan

May 24, 2023

**Appearances**

<u>For the Union</u>:

Nathaniel G. Lambright, Esq.
F. Wesley Turner, Esq.
Blitman & King LLP
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
nglambright@bklawyers.com
fwturner@bklawyers.com

<u>For the Employer</u>:

Shannon Buffum, Esq.
Associate General Counsel
Cornell University
300 CCC Building
235 Garden Avenue
Ithaca, New York 14853
skh29@cornell.edu

## Introduction

The instant matter arises under the 2021-2026 collective bargaining agreement ("CBA") between Cornell University ("Employer," "Cornell University," or "University") and the Tompkins-Cortland Building and Construction Trades Council ("Union" or "BTC"). The parties to the CBA selected Arbitrator Michael G. Whelan to decide a grievance submitted by the Union. The parties presented evidence and argument on March 2, 2023, in Ithaca, New York. At the close of the evidentiary hearing, the parties agreed to submit post-hearing briefs by April 14, 2023. After the Union requested and received a two-week extension of time for submitting briefs, both parties timely filed their briefs on April 28, 2023, and on that date the record was deemed to be closed.

## Issue

The parties stipulated that the instant grievance was arbitrable and properly before the Arbitrator and to the following statement of the issues:

1.  Did the University violate Article 1 and/or Article 30 of the collective bargaining agreement when NYSEG and/or DDS Companies performed work pursuant to an easement between the University and NYSEG in summer 2022?

2.  If so, what shall be the remedy?

## Relevant Contract Language

### Article 1
### Recognition

This Agreement is between Cornell University, hereinafter referred to as the Employer, and Tompkins-Cortland Counties Building Trades Council, Maintenance Division, hereinafter referred to as the Union. The local unions which are members of the Tompkins-Cortland Counties Building Trades Council, Maintenance Division are the following:

Local #241     - International Brotherhood of Electrical Workers
Local #81      - United Association of Plumbers and Steamfitters
Local #277     - North Atlantic States Regional Council of Carpenters
Local #3NY    - Bricklayers & Allied Craftworkers

2

Local #178      - IUPAT Painter District Council No. 4
Local #112      - SMART Twin Tier Sheet Metal Workers
Local #785      - Laborers International Union of North America

The definition of craft maintenance as applied to this agreement shall be as follows:

All work associated with the demolition, repair, replacement, improvement to or construction of equipment, buildings, structures, utilities, and/or system or components thereof. Craft maintenance for trades assistants shall be limited to work assigned to individuals employed as building trade laborers and which directly assists the craft work performed by other employees covered by this agreement; the Employer is free to assign such work; provided, however, such assignment does not fall within the craft performed by other employees covered by this agreement.

Not included in the definition is the work associated with the monitoring, tests, lubrication, and other repetitive preventive maintenance work performed by Facilities Management mechanical maintenance staff or qualified technicians of such University offices as Environmental Health & Safety, etc.

The University and the Union recognize and agree that high standards of workmanship, efficiency, work quality and productivity are in their mutual best interests. To this end the Union shall meet periodically with representatives of the University, and the Union and its members shall cooperate with the University in identifying the means to improve both workmanship and productivity.

The Employer recognizes the Union as the exclusive representative for electricians and lineworkers, painters, plumbers, steamfitters, controls mechanics, welders, refrigeration mechanics, carpenters, masons, sheet metal workers; and, building trade laborers, including journeypersons, apprentices and temporary employees (except temporary student trades assistants whom the Employer is free to hire as it deems necessary provided no regular building trade laborer is on lay off status under this Agreement) in such jobs, but excluding supervisors, all other employees for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment. Any and all such employees shall receive at least the minimum wages and work under the conditions of this Agreement.

This Agreement shall be effective at Cornell University in Ithaca, New York, and shall include the University facilities in Tompkins County, New York, and cover craft maintenance performed at the University.

## Article 5
## Grievance Procedure

The purpose of this Article is to establish procedures for the processing and settlement of grievances. All grievances shall be handled and disposed of solely in accordance with the procedures prescribed in this Article.

## Uniform Provisions for Grievance Procedures

...

• Grievance settlements shall not establish a precedent or practice for either party unless mutually agreed upon.

• The Union may withdraw a grievance at any step without prejudice or precedence.

• Whenever the University fails to meet the time limits required in the grievance procedure, the Union may appeal the grievance at issue to the next step. Whenever the Union fails to meet the time limits required in the grievance procedure, the grievance shall be regarded as settled on the basis of the University's last response or position. Initial steps and the time limits of the grievance procedure may be waived by written mutual agreement of the Union and the University.

...

## Process for Jurisdictional Issues and Intra-Union and Non-Union Disputes

Definition: A jurisdictional dispute shall include a claim by the Union or one of the craft unions listed in Article 1, Recognition, that employees represented by a different labor organization were improperly assigned work that should have been assigned to employees represented by the Union or listed craft union. A grievance which alleges that the employer failed to apply terms of this agreement to any work defined as "craft maintenance" under this agreement, by assigning work to non-union personnel shall also be addressed under this procedure, as will disputes involving intra-union work assignments.

## Step 1

The Union representative may file a formal grievance with the Director of Workforce Policy & Labor Relations within ten (10) working days from the date of the alleged violation. The formal grievance shall be written, identifying the terms of the Agreement alleged to have been violated, the date of the occurrence, the names of individuals involved, a brief description of the occurrence and the remedy sought by the grievant.

The grievance shall be scheduled and heard within five (5) working days from its receipt. A written response shall be given by management to the Union representative within five (5) working days from the date of the Step 1 meeting.

**Step 2 - Grievance Mediation**

If the parties fail to resolve the dispute through the Step 1 process, within twenty (20) working days from the receipt of the Step 1 answer, the Union may request a Federal Mediator from the Federal Mediation and Conciliation Service for the purpose of grievance mediation. The parties shall meet with the mediator at the earliest possible date in an attempt to resolve the dispute.

**Step 3 - Arbitration**

If the parties fail to resolve the dispute through the Step 2 process the President of the Building Trades Council may appeal the grievance to arbitration by submitting an official written notice to the Director of Workforce Policy & Labor Relations within thirty (30) working days after the mediation meeting. The parties will thereafter attempt to agree on a mutually acceptable arbitrator to hear and decide the matter. If the parties are unable to agree on an arbitrator or in the event the agreed upon arbitrator cannot or will not accept the assignment, either party may request a panel of nine (9) arbitrators from the Federal Mediation Conciliation Service (FMCS). The parties should then strike the names and/or number their selections and return the panel to the FMCS for the designation of an arbitrator. If no arbitrator is selected from the first panel, the FMCS shall send the parties a final panel of five (5) arbitrators. The parties will then strike names, alternately, until the name of the arbitrator who is to serve remains. The party who strikes first will be determined by lot.

The jurisdictional authority of the arbitrator is defined and limited to the determination as to whether there have been violations of the provision or provisions of this Agreement as set forth in the written grievance. The arbitrator shall have the authority to issue an appropriate remedy which may include a monetary award. The arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement. The decision of the arbitrator shall be based exclusively on evidence presented at the arbitration hearings and shall be final and binding on all involved parties.

The parties shall bear their own expenses and share in the arbitrator's fee and expenses equally. Each party shall be responsible for the expenses of its witnesses and representatives.

## Article 30
## Management Rights

The parties agree that operation of the University including management and direction of its employees, and their work, is the exclusive right of the University. Certain functions, powers and responsibilities belong solely to the University, prominent among which, but not wholly inclusive are: to determine the qualifications for hiring, promotion and transfer; to supervise the employees; to determine standards of quality and performance; to establish

and enforce reasonable work rules; to determine the work to be performed and who is to perform it within the established craft jurisdictions; to determine the hours of work, except as limited by Article 14, Hours of Work and Overtime; to determine what methods and equipment will be utilized together with all staffing requirements; to sub-contract, or to contract out, provided that, only with respect to work that falls within the jurisdiction of the craft unions covered by this Agreement and is performed within the geographical limitations of the job site, the University will sub-contract or contract out to sub-contractors or contractors who have agreements with craft unions listed in Article 1, Recognition; to terminate or divest itself of any part of the University operation, temporarily or permanently; to establish rules and procedures for discipline and discharge employees for just cause; to establish, change or eliminate appropriate job classifications.

It is understood that all the functions, powers, and responsibilities of the University are retained except those expressly modified by an express provision of this Agreement.

The University must inform the Union, at least ninety (90) calendar days in advance of the termination or divestment of itself from any part of the University operation.

## Background Facts

A.  The parties

Cornell University is a private research university based in Ithaca, New York. The Tompkins-Cortland Building and Construction Trades Council is the exclusive bargaining representative of about 197 University employees working in the building and construction trades identified in Article 1 of the CBA.

B.  The nature of the case

In the summer of 2022, non-union workers of a company by the name of DDS Companies were observed by the Union performing work related to the installation of a gas pipeline (the "Pipeline Project" or "work at issue") on Cornell University's campus in Ithaca, New York. This case is about whether the University violated the Recognition Article and/or the subcontracting provisions of the Management Rights Article by allowing New York State Electric and Gas ("NYSEG") and its contractor DDS Companies to perform this work pursuant to an easement granted by the University.

6

C.  The parties' collective bargaining relationship

The Union is made up of multiple trade unions representing workers in a variety of building industries and some of the trade unions in the BTC jointly bargain with the University and are signatories to the CBA. Cornell University and the BTC have been parties to collective bargaining agreements for over 50 years. Article 1—Recognition—in the CBA provides that the various trade unions making up the BTC have exclusive jurisdiction over "[a]ll work associated with the demolition, repair, replacement, improvement to or construction of equipment, buildings, structures, utilities, and/or system or components thereof." The jurisdictional language in Article 1 further provides that the "Agreement shall be effective at Cornell University in Ithaca, New York, and shall include the University facilities in Tompkins County, New York… ." Pursuant to Article 30—Management Rights—the University may subcontract work covered by the scope of the Union's jurisdiction but only "to sub-contractors or contractors who have agreements with craft unions" that are members of the Union.

D.  The Easement granted to NYSEG by the University

The University has an expansive campus in Ithaca, New York. Given the breath of its real estate holdings, the University regularly enters into easements, including about one or two new easements per year.  In May 2022, the University entered into an easement (the "Easement") with NYSEG for the purpose of replacing an aging existing gas pipeline that served the utility needs of University and non-University properties.

The Easement covered a part of the University's Ithaca Campus on University Avenue, in between Stewart Avenue and West Avenue, and was provided to:

> [I]nstall, construct, reconstruct, extend, operate, inspect, maintain, repair, replace, and at its pleasure, remove an underground gas pipeline, including hand/man holes, pipes, ducts and conduits with the necessary fixtures or appurtenances thereto which [NYSEG] shall require now and from time to time for the underground transmission and/or distribution of natural and/or manufactured gas for public or private use, in, under, and across said land and/or the highways abutting or running through said land.

7

The University retained certain rights over the land subject to the Easement and the work performed by NYSEG, including:

> the right to access, excavate within and otherwise use said easement area in order to install, maintain, repair and replace any of [Cornell's] utilities located within said easement subject to the following: (1) [Cornell] shall provide [NYSEG] with thirty (30) days' notice before excavating or conducting planned maintenance work within said easement that could potentially impact, damage or interfere with [NYSEG's] facilities; (2) [Cornell] reserves the right to work within the easement area without notice in cases of emergency posing an immediate threat to life, safety or property, provided however that [Cornell] shall notify [NYSEG] as soon as possible regarding all emergency excavations or other activities with the potential to impact, damage or interfere [NYSEG's] operation, use or maintenance of its facilities or where shut down of gas service may be necessary. [NYSEG] shall reasonably cooperate with [Cornell], upon request, to facilitate [Cornell's] use of the easement area.

The University also retained other rights including the right to maintain existing mature trees and vegetation and "cultivate the ground" on the easement, the right "to cross and recross said easement and right of way," and the right "to restore the easement area following any work or other site disturbance by [NYSEG]." In addition, the Easement provides that "[t]he parties shall work cooperatively when restoring the easement area."

E. The work performed by the DDS Companies

Shortly after obtaining the Easement, NYSEG constructed and installed a gas pipeline on University Avenue between Stewart and West Avenues using the non-union contractor DDS Companies to perform the work. The type of work performed by the DDS Companies during the Pipeline Project included digging, the removal of a sidewalk, blocking of streets, fusion of pipe, and restoration of the area. Digging and flagging can be performed by laborers; sidewalk repair can be performed by masons; and the installation of gas pipe can be performed by plumbers or pipefitters. None of the work on the Pipeline Project was performed by NYSEG employees represented by IBEW Local 10—a sister local of IBEW Local 241 that is a member of the BTC.

8

F.  The instant grievance

On August 10, 2022, the BTC filed a grievance alleging that the work performed by NYSEG (through contractor DDS Companies) was a violation of Articles 1 and 30 of the Agreement. The parties were unable to resolve the grievance in their contractual grievance procedure, which led to the instant proceedings.

## Positions of the Parties

A.  The Union's Position

The Union submits that its grievance must be sustained because the plain language of the CBA unambiguously gives it exclusive jurisdiction over the construction and repair of utilities at the University, including the installation of a gas pipeline and subsequent related work involved in this case. The Union contends that under the plain language of the CBA, its exclusive jurisdiction applies to the construction and repair of "utilities" at Cornell University, and specifically, is "effective at Cornell University in Ithaca, New York, and shall include the University facilities in Tompkins County, New York, and cover craft maintenance performed at the University." Based on this language, the Union argues that the construction of a gas pipeline on University Avenue is the construction of a utility at Cornell University in Ithaca, New York, and, therefore, the parties have agreed that the work is unambiguously within the Union's exclusive jurisdiction.

As to the University's claim that the disputed work was done pursuant to an easement provided to NYSEG, the Union claims that an easement allows for use of the property, but does not transfer ownership of the property, and because the University still owns the land on its campus, the Easement does not negate the University's clear obligations under the CBA. Further, the Union claims that the CBA does not provide an exception for work done pursuant to an easement, which the University could have conditioned on compliance with the CBA but chose not to.

As to the University's argument that two previous instances of non-union contractors performing work under easements established a binding past practice that

permitted the disputed work to be performed, the Union contends that this argument fails because a past practice cannot override clear contractual language, and the two instances in question—one in 2011 and another in 2015—do not meet the standard of establishing a binding past practice that would permit non-union contractors to encroach on its work jurisdiction when easements are involved.

As a remedy to the alleged contract violation in this case, the Union requests that: (1) its members who should have performed the work be made whole; (2) the University be ordered to cease and desist from entering into any future easements that authorize non-union contractors to perform bargaining unit work; and (3) the Arbitrator retain jurisdiction to resolve any disputes about the make whole remedy.

B. The Employer's Position

The Employer submits that the Union's grievance must be denied because the work at issue performed by a non-union contractor was not subject to the CBA. In that regard, the University claims that the Union's exclusive jurisdiction only applies to "University facilities" and the real property interests involved are held by NYSEG as an easement grantee and the improvements installed by an easement grantee are not "University facilities." Thus, the Employer contends that the Union has not met its burden of proof to demonstrate that the NYSEG right of way is a University facility when NYSEG is performing the work pursuant to the Easement.

In support of its position, the University notes that an easement is the permanent transfer of a property interest in land from the landowner to another entity, and it provides the grantee with the right to use and control that land for the specified purpose. In this matter, the University submits that it granted NYSEG the right to use and control the designated property for NYSEG's purposes – the installation and maintenance of a gas pipeline. The University claims that the installation of the gas pipeline was performed by NYSEG, for the benefit of NYSEG, and on property controlled by NYSEG as grantee of the Easement, and that the University did not control the designated property for the

purpose of installing a gas pipeline, and did not demand, direct or control any of the work performed by NYSEG.

In addition, the University contends that there is no support or authority in the CBA or in the parties' past practice to extend the definition of a "University facility" to a property that has been wholly or partially transferred to a third party, particularly when the University cannot control NYSEG's exercise of its rights under the Easement by demanding that NYSEG be subject to a collective bargaining agreement it is not a party to. The University not only claims that the Union presented no evidence demonstrating that NYSEG's property interest in the Easement or in any of its improvements located within the Easement could reasonably be deemed "University facilities," but also the Union cannot meet its burden of proof on this issue because an easement is the permanent transfer of a property interest to a third party—here from the University to NYSEG and the property interest cannot be a University facility after it is relinquished. The University also contends that it cannot assert any kind of ownership interest to the NYSEG facilities located within the Easement – any more than a private homeowner could claim to own NYSEG pipelines, electric lines or poles located within a NYSEG easement.

The University also challenged the Union's argument that the gas line installed by NYSEG is a "University facility" because it serves University properties by explaining that the gas pipeline was not installed by NYSEG solely to service University buildings, but also to service the greater Ithaca community as part of NYSEG's pipeline network, which is supported by the language of the Easement itself which describes the purpose of the gas pipeline as "public or private use." Moreover, the University maintains that even if the pipeline exclusively served University properties, NYSEG would nevertheless retain ownership and the right to control work on the pipeline.

Moreover, the University contends that the Union did not meet its burden of proof to support its claim that it has exclusive jurisdiction to perform the disputed work. The University submits that, at a minimum, the Union needed to present evidence that the

11

Union had historically done, at the very least, the majority of the work in question, and even then, a majority of the work would seem insufficient to justify a classification of exclusive jurisdiction. The University claims that the Union has not met this standard because the Union presented no evidence that it has ever historically performed the work in question; that is, work performed in the interest of an easement grantee—in this case, a public utility easement holder. Further, the University claims that the Union could not have presented any evidence regarding its historical performance of work within third party easements because the trades covered under the CBA have never been used to perform such work, for the simple reason that such easements and the facilities located on the campus do not belong to the University.

The University also argues that the Union has forfeited any claim it may have had to the right to the disputed work by its failure to pursue similar matters in 2011 and 2015, and that its previous conduct demonstrates its knowledge and agreement with the fact that property under easement to third party utility companies are not "University facilities" and are thus not within the exclusive jurisdiction defined in Article 1 of the CBA. The University also contends that the Union Business Agent's claim that the Union abandoned previous grievances only because he assumed that the easements with NYSEG and Verizon pre-dated the Union's collective bargaining relationship with the University too unusual and not worthy of belief.

Finally, the University claims that the remedy sought by the Union is inappropriate and impossible to execute because the University has permanently relinquished the "right, privilege and authority to install, construct, reconstruct, extend, operate, inspect, maintain, repair, replace, and at its pleasure, remove an underground gas pipeline" to NYSEG under the Easement, and it does not retain authority to perform this work on NYSEG's behalf. The University submits that due to the terms of the Easement, it has no legal standing to exercise the control asserted by the BTC given the separate and distinct property interests of NYSEG and the University defined in the Easement. The

University also claims that an award of lost hours and benefits as requested by the Union would be wholly inappropriate as those costs were not incurred by the University for any University purpose, as the University had no role in the decision to perform the work at all, let alone determine the budget and scope of the project performed and staffed by NYSEG for its own purposes.

**Discussion**

In contract interpretation cases, the moving party – typically a grievant or a union – bears the burden of production and persuasion. R. Abrams, *Inside Arbitration* 301-302 (2013); F. Elkouri & E. Elkouri, *How Arbitration Works* 422-424 (6th ed. 2003). The issue in this case involves whether the University violated the CBA in the summer of 2022 when NYSEG and/or DDS Companies performed work pursuant to an easement between the University and NYSEG. Thus, the Union has the burden to produce persuasive evidence that the University violated the CBA when NYSEG and/or DDS Companies performed this work.

A. Whether the plain language of the CBA grants the Union the exclusive jurisdiction over the work at issue

The Union contends that under the plain language of the CBA the parties have agreed that the work performed by NYSEG and/or DDS is unambiguously within the Union's exclusive jurisdiction. If the language of the CBA is plain and clear, the so-called "plain meaning rule" dictates that it should be given its ordinary meaning. *See* F. Elkouri & E. Elkouri, *How Arbitration Works* 434 (6th ed. 2003); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002) ("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms").

The CBA language at issue is from Article 1—Recognition. The relevant parts of this language that define the Union's jurisdiction are stated as follows:

The local unions which are members of the Tompkins-Cortland Counties Building Trades Council, Maintenance Division are the following:

Local #241  - International Brotherhood of Electrical Workers
Local #81    - United Association of Plumbers and Steamfitters
Local #277  - North Atlantic States Regional Council of Carpenters
Local #3NY - Bricklayers & Allied Craftworkers
Local #178  - IUPAT Painter District Council No. 4
Local #112  - SMART Twin Tier Sheet Metal Workers
Local #785  - Laborers International Union of North America

The definition of craft maintenance as applied to this agreement shall be as follows:

All work associated with the demolition, repair, replacement, improvement to or construction of equipment, buildings, structures, utilities, and/or system or components thereof. ...

The Employer recognizes the Union as the exclusive representative for electricians and lineworkers, painters, plumbers, steamfitters, controls mechanics, welders, refrigeration mechanics, carpenters, masons, sheet metal workers; and, building trade laborers, including journeypersons, apprentices and temporary employees ... in such jobs.

This Agreement shall be effective at Cornell University in Ithaca, New York, and shall include the University facilities in Tompkins County, New York, and cover craft maintenance performed at the University.

This language includes three elements the Union must meet to establish that it has jurisdiction over work at the University. First, the work must be "craft maintenance" involving the crafts listed and performed by the unions comprising the BTC. Second, the work must be of the type or scope defined. Finally, the work must occur at a location where the CBA is effective.

There does not appear to be any dispute that the Union has presented sufficient evidence to establish that the work at issue meets the first two elements. Specifically, the Employer has recognized the crafts that were able to perform this work—plumbers, steamfitters, building trade laborers, and masons—and the Pipeline Project is within the scope of work because it was "craft maintenance" that involved the "improvement to or

14

construction of … utilities." The disputed issue involves the "location element" and whether the CBA applies to the Pipeline Project.

The Union argues that under the plain language of the CBA, its exclusive jurisdiction is "effective at Cornell University in Ithaca, New York" and because the Pipeline Project was at Cornell University in Ithaca, New York, the parties have agreed that the work is unambiguously within the Union's exclusive jurisdiction. The Employer argues that the CBA does not apply to the Pipeline Project because the Union's exclusive jurisdiction applies to "University facilities" and the real property interests involved here are held by NYSEG as an easement grantee and the improvements installed by an easement grantee are not "University facilities."

Parsing through the location element of the jurisdiction clause shows that it contains three phrases. The first phrase broadly identifies the scope of the Union's jurisdiction as "at Cornell University in Ithaca, New York." The second phrase—"and shall include the University facilities in Tompkins County, New York"—introduces the concept of University facilities and expands the location of the Union's jurisdiction to all of Tompkins County. The third phase makes it explicit that the CBA is intended to "cover craft maintenance performed at the University."

It is clear that the work at issue occurred "at Cornell University in Ithaca, New York" and that it covered "craft maintenance performed at the University." However, the University's argument presumes that the work must also "include the University facilities in Tompkins County, New York" to meet the requirements of the jurisdiction clause. The conclusion that must be drawn from the parties' competing arguments is that the language of the jurisdiction clause is ambiguous and does not clearly establish that the work at issue belongs to the Union.

B. Whether the Union must establish that work is performed at Cornell
University *and* on University facilities to have jurisdiction

In order to resolve this ambiguity it is necessary to continue to parse the language
of the jurisdiction clause.[1]  The University did not counter the Union's argument that all
that is necessary to meet the location element of the jurisdiction clause is to establish that
the work was performed at Cornell University in Ithaca, New York. Rather, the
University's argument hinges on its presumption that the work at issue must also be
performed on "University facilities." This presumption is supported by the fact that the
language in the first two operative phrases of the location requirement—"[t]his
Agreement shall be effective at Cornell University in Ithaca, New York, *and* shall include
the University facilities in Tompkins County, New York"—are joined by the conjunction
"and," which suggests that the Union must satisfy both conditions to establish its
jurisdiction.

On the other hand, the Union's argument is more persuasive for a few reasons. To
begin, the use of the word "include" in the phrase "and shall *include* University facilities"
suggests that there may be other types of work that the Union has jurisdiction over "at
Cornell University" in addition to "University facilities." For example, the scope of work
in the jurisdiction clause includes "work associated with… equipment," yet "equipment"
does not fall within the definition of the word "facilities."[2]

In addition, the phrases "at Cornell University in Ithaca, New York" and "shall
include University facilities in Tompkins County, New York" differ regarding the
boundaries of the Union's jurisdiction. Specifically, the latter phrase expands the location

---

[1] There was no evidence presented at the hearing regarding the intent of the parties when they drafted
and negotiated the Recognition Article that would help to resolve this ambiguity.

[2] "Facilities" are commonly defined as structures that are built, installed, or established to serve a
particular purpose. https://www.merriam-webster.com/thesaurus/facility (May 13, 2023). The word
"facility" is also commonly used to describe utilities, as shown in the Easement.

of the Union's jurisdiction beyond Ithaca to other areas within Tompkins County.[3] This shows that both phrases have independent meanings that are important to understand the geographic scope of the Union's jurisdiction.

Finally, because the City and Town of Ithaca are entirely within Tompkins County, if the Union has to establish that the work at issue involved "University facilities in Tompkins County" to meet its jurisdictional requirement, then the phrase "at Cornell University in Ithaca" would be superfluous language. It is a tenet of contract construction that an interpretation of an agreement that would nullify or render meaningless any part of the agreement should be avoided as it is the general presumption that parties do not carefully write into a negotiated agreement words intended to have no effect. F. Elkouri & E. Elkouri, *How Arbitration Works* 463-464 (6th ed. 2003). This further suggests that the phrase "[t]his Agreement shall be effective at Cornell University in Ithaca" was intended to mean that the Union can establish the location element of the jurisdictional requirement on this basis alone, independent of the alternative basis of whether the work is performed at "University facilities in Tompkins County."

C. Whether the Pipeline Project involved "University facilities"

The University's central argument is that the real property interests involved in this case are held by NYSEG as an easement grantee that the University does not control, and the improvements installed by an easement grantee are not "University facilities." Even if that argument were persuasive on the matter of the Union's jurisdiction to perform the work at issue—which it is not—some of the work on the Pipeline Project involved University facilities.

The term "University facilities" implies that the facilities are owned by Cornell University. It is clear that despite the limited rights granted to NYSEG under the terms of the Easement, the University owns the property where the work at issue took place. In

---

[3] Ithaca is a City enclosed by a town of the same name and is located within Tompkins County, New York. The University has several locations outside of Ithaca, New York.

that regard, the Easement identifies Cornell University as the owner of the property. The Easement also provides that the University has substantial control over the property. Specifically, the Easement reserves to the University the right to "access, excavate within and otherwise use said easement area" to maintain its own utilities located "within said easement," and the University is free to cultivate the ground, cross over the ground, grow trees on the ground and excavate the area. The University also has the right to maintain mature trees and vegetation within the easement right of way area, and it could widen the sidewalk over the right-of-way area if it wanted to do so. In addition, the Easement provides a procedure the University can follow if it wants to relocate the easement. In sum, NYSEG has limited control over the property and, even if the pipeline is a NYSEG facility, the University maintains effective control over the right-of way area—including the sidewalks, which are University facilities.

The University's claim that it did not control the designated property for the purpose of installing a gas pipeline, and did not demand, direct or control any of the work performed by NYSEG is only partially accurate. Although the Easement may not have given the University control over the installation of the pipeline, the Easement explicitly provides that the University "shall also have the right to restore the easement area following any work or other site disturbance by [NYSEG]." Significantly, this provision establishes that the University could have used BTC members—presumably building trade laborers, and masons—to restore the Pipeline Project site and the sidewalks under the current Easement.

Further, the University's claim that it did not control the designated property for the purpose of installing a gas pipeline raises the issue of whether it was necessary for the University to relinquish such control. There was no evidence that the University was required to give NYSEG an easement over University property, and regardless of the circumstances under which it was granted, there is evidence that the University had significant control over negotiating the terms of the Easements. As discussed above, the

18

University maintains significant control over the property subject to the Easement and, although the Easement appears to contain some "boilerplate" from similar easements granted by the University, several provisions have been modified—as indicated by strikethroughs of certain passages—to benefit the University.[4]  These modifications and other provisions of the Easement expressing the parties desire to "work cooperatively," suggest that the University has considerable authority to negotiate easement provisions that would allow it to meet its obligations to the Union under the CBA.[5]

      D.  Whether the Union has exclusive jurisdiction to perform the work at issue

The University also argues that the Union did not meet its burden of proof to support its claim that it has exclusive jurisdiction to perform the disputed work. The University claims that the Union has not met its burden because it did not present any evidence that it had historically performed work in the interest of an easement grantee— in this case, a public utility easement holder. This argument is not persuasive. The work at issue is not "work performed in the interest of an easement grantee." Rather, it is installing a gas pipeline, which the evidence shows is within the capabilities of the crafts in the BTC.[6]

---

[4] Specifically, (1) a limitation on the scope of responsibility for damage caused by the Grantee ("NYSEG") has been removed; (2) a prohibition on the University's right to excavate around the area of the Easement has been removed; and (3) a right of the Grantee to cut and remove brush within the Easement right-of-way has been removed.

[5] For example, the University could condition utility easements on being able to approve the entities that perform the work. This is a reasonable condition because the University, as the owner of the property, should not be subject to the whim of the easement grantee to determine who will perform the work. Such an approval process would be likely to meet the objection of the Union here that, if the Union members themselves do not perform the work, it would be performed by union-represented employees. As the Union President testified, he would not have filed the instant grievance if NYSEG had performed the work itself using IBEW Local 10 members, notwithstanding that the CBA forbids any subcontractors that are not signatory to one of the unions within the BTC.

[6] The University did not argue that the disputed work was of such a magnitude that it could not be performed by its employees in the BTC, or that unit members lacked the expertise or equipment necessary to perform the work.

E.  Whether the Union forfeited any claim to the work at issue

Finally, the University argues that the Union has forfeited any claim it may have had to the right to the work at issue by its failure to pursue similar matters in 2011 and 2015, and that its previous conduct demonstrates its knowledge and agreement with the fact that property under easement to third party utility companies are not "University facilities" and are thus not within the exclusive jurisdiction defined in Article 1 of the CBA.

It is not clear that the Union's previous conduct demonstrates its knowledge and agreement that property under easement to third party utility companies are not "University facilities." The evidence shows that previous Union leadership took issue with the non-union labor used by the University's utility contractors in the past and then failed to pursue grievances based on their understanding that these were old easements in effect prior to the Union's collective bargaining relationship with the BTC. Recently, the Union leadership has received advice that has caused it to reconsider the matter. In any event, the issue is whether the Union's previous failure to fully pursue these prior grievances is a barrier to pursuing the instant matter.

The right of the Union to jurisdiction over certain work is provided in Article 1—Recognition. In the absence of evidence that the parties have agreed to modify their agreement, the Union maintains the right to insist on compliance with the CBA regardless of any past conduct of the Union. R. Abrams, *Inside Arbitration* 269-270 (2013). There is no evidence that the parties have agreed to modify Article 1 to exclude work performed by the grantee of an easement, and the extent of the Union's prior actions to enforce its rights to perform work defined in the Recognition Article is of no consequence to its right to enforce its rights today. For this reason, the Union did not forfeit its claim to the work at issue.

20

## Conclusion

For the above-stated reasons, the Arbitrator concludes that the University violated Article 1 of the CBA when it permitted NYSEG or the DDS Companies to perform work pursuant to the Easement between the University and NYSEG in summer 2022.

## Remedy

As a remedy to this contract violation, the Union has requested that its members who should have performed the work be made whole. The University claims that this remedy would be wholly inappropriate as those costs were not incurred by the University for any University purpose, as the University had no role in the decision to perform the work at all or determine the budget and scope of the project performed and staffed by NYSEG for its own purposes. It is inaccurate to conclude that the Pipeline Project was solely for the benefit of NYSEG, as the evidence shows that it serves University and non-University customers, so there is clearly a benefit to the University in having gas service to its properties. In addition, at the time the University entered into the Easement that permitted the work—which was shortly before the work was performed—it was in a position to negotiate how the work would be performed and the allocation of the costs involved. Under these circumstances, it is appropriate to hold the University responsible for the loss of compensation due to unit members who should have performed the work.

Accordingly, the Award below shall require that affected members of the bargaining unit be made whole for lost wages as a result of the loss of work. To arrive at this determination for the Pipeline Project from beginning to completion, the parties shall agree upon: (1) the crafts covered by the CBA involved in the Pipeline Project; and (2) the number of hours worked by personnel in each craft by position (i.e., journeypersons, apprentices). After that task is completed, the Union shall identify the names of employees in the crafts and positions affected and the number of hours each of them shall be compensated. These employees shall be compensated by the University for these hours at their current straight time hourly rates. If the parties are not able to agree on

21

these issues, the Arbitrator will reserve jurisdiction for thirty days to resolve any disputes concerning the interpretation or application of the Award.

The Union also requested that the University be ordered to cease and desist from entering into any future easements that authorize non-union contractors to perform bargaining unit work. This also is an appropriate remedy because, as discussed above, the University has considerable authority to ensure that its easements adhere to the Recognition Article or at least ensure that non-union contractors are not performing work within the Union's exclusive jurisdiction.

**Award**

Based on the above discussion and analysis, the Arbitrator awards as follows:

1.    The grievance is sustained.

2.    Unit members who suffered a loss of work shall be identified and made whole pursuant to the procedure described above in the Remedy section of this Opinion and Award.

3.    The University shall cease and desist from entering into any future easements that authorize non-union contractors to perform work within the exclusive jurisdiction of the Union.

4.    The Arbitrator shall retain jurisdiction for thirty days from the date of this Award to resolve any issues over the interpretation or application of this Award.

Michael G. Whelan

Date  5/24/23