# EXHIBIT 7
# (Union Post-Hearing Brief)

```
---------------------------------------------------------------------------
In the Matter of the Arbitration                    )
                                                    )
              Between                               )
                                                    )
TOMPKINS-CORTLAND BUILDING & CONSTRUCTION           )
TRADES COUNCIL,                                     )        Case No. 231025-00637
                                                    )        Arbitrator Michael Whelan
                          Union,                    )
                                                    )
              and                                   )
                                                    )
CORNELL UNIVERSITY,                                 )
                                                    )
                          Employer.                 )
---------------------------------------------------------------------------
```

## POST-HEARING BRIEF ON BEHALF OF TOMPKINS-CORTLAND BUILDING & CONSTRUCTION TRADES COUNCIL

BLITMAN & KING LLP
*Attorneys for Tompkins-Cortland*
*Building & Construction Trades Council*
Office and Post Office Address
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
Telephone:  (315) 422-7111
Facsimile:  (315) 471-2623

Of Counsel:

    Nathaniel G. Lambright, Esq.
    F. Wesley Turner, Esq.

{B0320851.1}

**TABLE OF CONTENTS**

Page

STATEMENT OF THE CASE ...................................................................................... 1

RELEVANT CONTRACT PROVISIONS ...................................................................... 2

STATEMENT OF FACTS ........................................................................................... 4

    *1. The BTC's Exclusive Jurisdiction Covers Utilities at Cornell University* .................................. 4

    *2. Cornell Granted NYSEG the Right to Construct and Repair Utilities* ...................................... 4

    *3. DDS Constructed and Installed a Gas Pipeline* ........................................................................ 5

    *4. DDS Performed Bargaining Unit Work* ..................................................................................... 7

    *5. BTC Was Not Aware of Similar Prior Work Performed by a Non-union Contractor* .............. 7

ARGUMENT ............................................................................................................ 8

  POINT I - CORNELL VIOLATED BTC'S UNAMBIGUOUS EXCLUSIVE JURISDICTION ...................... 9

    *1. The Clear Language of the Agreement Establishes That Constructing a Gas Pipeline on University Avenue Is in BTC's Jurisdiction* .................................. 10

    *2. The Easement Does Not Excuse Cornell From Abiding by the Agreement* .................... 12

    *3. Cornell Could Have Granted NYSEG an Easement and Complied With the Agreement* 14

  POINT II - NO PAST PRACTICE EXISTS WITH RESPECT TO EASEMENTS ...................................... 18

CONCLUSION .......................................................................................................... 23

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acad. of Med. of Queens Cty. v. Seminole 75 Realty Corp.*, 832 N.Y.S.2d 286 (2d Dept. 2007)... 16

*Celanese Corp. of Am.*, 24 LA 168 (1954) ...................................................................... 19

*Clean Coverall Supply Co.*, 47 LA 272 (1966).................................................................. 10

*Color Art Printing*, 2003 BNA LA Supp. 110083 (2003) ................................................... 23

*Denver Newspaper Agency*, 121 LA 44 (2005)................................................................. 9

*Exide Corp.*, 98 LA 626 (1992) ....................................................................................... 22

*Gen. Drivers, W. & H. v. Riss & Co.*, 372 U.S. 517 (1963) ............................................... 21

*John Deere Tractor Co.*, 5 BNA LA 631 (1946)................................................................. 12

*Morgan v. Bolsan Realty Corp.*, 369 N.Y.S.2d 544 (3d Dept. 1975)................................. 16

*Murray v. Lancaster Motorsports, Inc.*, 812 N.Y.S.2d 726 (4th Dept. 2006) ................... 17

*Raven Indus., Inc. v Irvine*, 40 A.D.3d 1241 (2007) ........................................................ 14

*Russell, Burdsall & Ward Corp.*, 84 BNA LA 373 (1985) ................................................. 12

*Somers v. Shatz*, 22 A.D.3d 565 (App. Div. 2nd Dept. (2005) ........................................ 14

*Tagle v. Jakob*, 97 N.Y.2d 165 (2001).............................................................................. 17

*Trustees of Town of Southampton v Jessup*, 162 N.Y. 122 (1900)................................... 13

**Other Authorities**

Elkouri & Elkouri, How Arbitration Works (7th ed. 2012) ............................................... 10

## STATEMENT OF THE CASE

This is an arbitration between the Tompkins-Cortland Building & Construction Trades Council ("BTC") and Cornell University pursuant to the Collective Bargaining Agreement covering the years 2021-2026 ("Agreement").  Jt. Exh. 1.[1]  This dispute involves the performance of work within BTC's exclusive jurisdiction by non-union employees in violation of Article 1 of the Agreement.

Pursuant to the contractual grievance procedure, this dispute was submitted to arbitration on March 2, 2023, Arbitrator Michael Whelan presiding.  At the hearing, the parties agreed the Arbitrator would resolve the following issues:

1. Did the University violate Article 1 and/or Article 30 of the collective bargaining agreement when NYSEG and/or DDS Companies performed work pursuant to an easement between the University and NYSEG in summer 2022?

2. If so, what shall be the remedy?[2]

This post-hearing brief is submitted in support of the Union's position that Cornell violated the Agreement when non-union workers employed by DDS performed bargaining unit work on Cornell University property in Ithaca, New York.

The Arbitrator should sustain the grievance and order Cornell to cease allowing bargaining unit work being performed by non-union contractors at Cornell and make whole all bargaining unit members for lost hours for work already performed.

---

[1] References in this form are to the Joint Exhibits accepted into evidence at the hearing; references denoted by "Un. Exh." refer to the Union's exhibits.

[2] NYSEG references New York State Electric & Gas.

{B0320851.1}

## RELEVANT CONTRACT PROVISIONS

### ARTICLE 1
### RECOGNITION

This Agreement is between Cornell University, hereinafter referred to as the Employer, and Tompkins-Cortland Counties Building Trades Council, Maintenance Division, hereinafter referred to as the Union. The local unions which are members of the Tompkins-Cortland Counties Building Trades Council, Maintenance Division are the following:

Local #241 - International Brotherhood of Electrical Workers

Local #81 - United Association of Plumbers and Steamfitters

Local #277 - North Atlantic States Regional Council of Carpenters

Local #3NY - Bricklayers & Allied Craftworkers

Local #178 - IUPAT Painter District Council No. 4

Local #112 - SMART Twin Tier Sheet Metal Workers

Local #785 - Laborers International Union of North America

The definition of craft maintenance as applied to this agreement shall be as follows:
All work associated with the demolition, repair, replacement, improvement to or construction of equipment, buildings, structures, utilities, and/or system or components thereof. Craft maintenance for trades assistants shall be limited to work assigned to individuals employed as building trade laborers and which directly assists the craft work performed by other employees covered by this agreement; the Employer is free to assign such work; provided, however, such assignment does not fall within the craft performed by other employees covered by this agreement.

The Employer recognizes the Union as the exclusive representative for electricians and lineworkers, painters, plumbers, steamfitters, controls mechanics, welders, refrigeration mechanics, carpenters, masons, sheet metal workers; and, building trade laborers, including journeypersons, apprentices and temporary employees (except temporary student trades assistants whom the Employer is free to hire as it deems necessary provided no regular building trade laborer is on lay off status under this Agreement) in such jobs, but excluding supervisors, all other employees for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment. Any and all such employees shall receive at least the minimum wages and work under the conditions of this Agreement.

This Agreement shall be effective at Cornell University in Ithaca, New York, and shall include the University facilities in Tompkins County, New York, and cover craft maintenance performed at the University.

**ARTICLE 5**
**GRIEVANCE PROCEDURE**

The purpose of this Article is to establish procedures for the processing and settlement of grievances. All grievances shall be handled and disposed of solely in accordance with the procedures prescribed in this Article.

**Uniform Provisions for Grievance Procedures**
…
• Grievance settlements shall not establish a precedent or practice for either party unless mutually agreed upon.

• The Union may withdraw a grievance at any step without prejudice or precedence.

• Whenever the University fails to meet the time limits required in the grievance procedure, the Union may appeal the grievance at issue to the next step. Whenever the Union fails to meet the time limits required in the grievance procedure, the grievance shall be regarded as settled on the basis of the University's last response or position. Initial steps and the time limits of the grievance procedure may be waived by written mutual agreement of the Union and the University.

**ARTICLE 30**
**MANAGEMENT RIGHTS**

The parties agree that operation of the University including management and direction of its employees, and their work, is the exclusive right of the University. Certain functions, powers and responsibilities belong solely to the University, prominent among which, but not wholly inclusive are: to determine the qualifications for hiring, promotion and transfer; to supervise the employees; to determine standards of quality and performance; to establish and enforce reasonable work rules; to determine the work to be performed and who is to perform it within the established craft jurisdictions; to determine the hours of work, except as limited by Article 14, Hours of Work and Overtime; to determine what methods and equipment will be utilized together with all staffing requirements; to sub-contract, or to contract out, provided that, only with respect to work that falls within the jurisdiction of the craft unions covered by this Agreement and that is performed within the geographical limitations of the job site, the University will sub-contract or contract out to sub-contractors or contractors who have agreements with craft unions listed in Article 1, Recognition; to terminate or divest itself of any part of the University operation, temporarily or permanently; to establish rules and procedures for discipline and discharge employees for just cause; to establish, change, or eliminate appropriate job classifications.

It is understood that all the functions, powers, and responsibilities of the University are retained except those expressly modified by an express provision of this Agreement.

The University must inform the Union, at least ninety (90) calendar days in advance of the termination or divestment of itself from any part of the University operation.

**STATEMENT OF FACTS**

1.      *The BTC's Exclusive Jurisdiction Covers Utilities at Cornell University*

The BTC is made up of multiple trade unions representing workers in a variety of building industries.  Some of the BTC's trade unions bargain collectively with Cornell through the BTC and are therefore signatories to the Agreement via the BTC.  Jt. Exh. 1.  Todd Bruer serves as the President of the BTC.  He is also the Business Manager of another of the BTC's trade unions, Local 241 of the International Brotherhood of Electrical Workers.  As President of the BTC, his responsibilities include ensuring that the Agreement is adhered to by Cornell; that bargaining unit work is performed by the BTC's members; and that disputes and grievances are processed on behalf of the BTC.

The Agreement guarantees the various trade unions making up the BTC exclusive jurisdiction over "[a]ll work associated with the demolition, repair, replacement, improvement to or construction of equipment, buildings, structures, utilities, and/or system or components thereof."  Jt. Exh. 1 at 3.  Cornell may subcontract this work but only "to sub-contractors or contractors who have agreements with craft unions" that are members of the Union.  Jt. Exh. 1 at 36.  This is a broad jurisdictional clause; it provides BTC exclusive jurisdiction over the construction and repair of utilities "at Cornell University in Ithaca, New York."

2.      *Cornell Granted NYSEG the Right to Construct and Repair Utilities*

On May 22, 2022, Cornell and New York State Electric and Gas ("NYSEG") entered into an easement.  Jt. Exh. 7.  Cornell granted NYSEG an easement on University Avenue, in between Stewart Avenue and West Avenue, to:

> [I]nstall, construct, reconstruct, extend, operate, inspect,
> maintain, repair, replace, and at its pleasure, remove an
> underground gas pipeline, including hand/man holes, pipes, ducts
> and conduits with the necessary fixtures or appurtenances
> thereto which [NYSEG] shall require now and from time to time
> for the underground transmission and/or distribution of natural
> and/or manufactured gas for public or private use, in, under, and
> across said land and/or the highways abutting or running through
> said land.

Jt. Exh. 7.  Cornell also explicitly retained certain rights over the land subject to the easement

and the work performed by NYSEG.  Specifically, Cornell reserved

> the right to access, excavate within and otherwise use said
> easement area in order to install, maintain, repair and replace any
> of [Cornell's] utilities located within said easement subject to the
> following: (1) [Cornell] shall provide [NYSEG] with thirty (30) days'
> notice before excavating or conducting planned maintenance
> work within said easement that could potentially impact, damage
> or interfere with [NYSEG's] facilities; (2) [Cornell] reserves the
> right to work within the easement area without notice in cases of
> emergency posing an immediate threat to life, safety or property,
> provided however that [Cornell] shall notify [NYSEG] as soon as
> possible regarding all emergency excavations or other activities
> with the potential to impact, damage or interfere [NYSEG's]
> operation, use or maintenance of its facilities or where shut down
> of gas service may be necessary.  [NYSEG] shall reasonably
> cooperate with [Cornell], upon request, to facilitate [Cornell's] use
> of the easement area.

Jt. Exh. 7.  Cornell and NYSEG agreed to "cooperate in good faith" to relocate the easement

upon request by Cornell.  Cornell further reserved its right to maintain existing mature trees

and vegetation and "cultivate the ground" on the easement.  Finally, it reserved its right "to

cross and recross said easement and right of way."  Jt. Exh. 7.

3.      *DDS Constructed and Installed a Gas Pipeline*

        Shortly after obtaining the easement, NYSEG constructed and installed a gas pipeline on

University Avenue between Stewart and West Avenues.  *See* Jt. Exh. 3.  In the summer of 2022,

Marcus Williamee, a business agent and organizer for UA Local 81, saw the work being performed and spoke with a contractor at the site.  Mr. Williamee testified that he saw the digging of a ditch, the removal of a sidewalk, a street blocked off, and a pipe fusion being performed.  Mr. Williamee also testified that he spoke with the contractor working at the site and learned that DDS, a non-union contractor, was performing the work through a subcontracting agreement with NYSEG.  Mr. Williamee further inquired about the work that was being performed and was told that the gas pipeline was connnected to one building, and it was fitted to allow for future buildings to be connected up to the pipeline.

Danny Addy is a full-time business manager for IBEW Local 10.  IBEW Local 10 is a sister local to BTC signatory IBEW 241, but Local 10 is not affiliated with the BTC itself.  Local 10 also has no direct contractual relationship with Cornell.  Local 10 represents NYSEG employees.  He confirmed that NYSEG had subcontracted the work to DDS, a non-union contractor, and the work was not performed by his members.  Mr. Addy testified that he was familiar with DDS, that it employed non-union workers, and that NYSEG had used them previously to perform gas-piping work in New York State.

Mr. Addy further testified that he did not learn about NYSEG's use of a non-union subcontractor on Cornell's campus for this project until President Bruer had informed him.  He then independently confirmed that DDS had installed the pipeline at issue.  Specifically, Mr. Addy testified that DDS installed a 1400 foot mainline in the street on Cornell's campus with service to one building and the ability to easily hook up to other buildings on University Avenue.

Mr. Addy testified that members of Local 10 could have done all of the work performed by DDS.[3]

4.   *DDS Performed Bargaining Unit Work*

Mr. Williamee testified that he personally witnessed DDS employees performing bargaining unit work.  Specifically, he stated that he witnessed digging, which is work that should be performed by the laborers; sidewalk repair, which is work that should be performed by the masons; flagging, which is work that should be performed by the laborers; and installation of a gas pipe, which is work that should be performed by the pipefitters.  President Bruer confirmed that all of this is clearly bargaining unit work.  He testified similarly that laborers, masons, and pipefitters perform the various tasks required in installing a gas pipe that DDS performed in this instance.  More specifically, President Bruer testified that work on utilities is bargaining unit work, for which BTC has exclusive jurisdiction at Cornell and which it regularly performs.  This testimony was unrefuted by Cornell.

5.   *The BTC Was Not Aware of Similar Prior Work Performed by a Non-union Contractor*

The BTC was not aware of any prior work performed by a non-union contractor on Cornell grounds pursuant to a newly granted easement.  The previous president of the BTC, David Marsh, testified that he inquired about work done pursuant to an easement on two occasions in 2011 and 2015.  *See* Co. Exhs. 3, 4.  These are the only two instances that Cornell

---

[3] President Bruer testified that he might not have filed a grievance had Cornell subcontracted this work to NYSEG and members of Local 10 had performed the work on behalf of NYSEG, even it if would technically constitute a violation of the Agreement.  President Bruer rationalized that the work at least would have been performed by members of the IBEW whom he knew were competent and safe.

could identify in which BTC bargaining unit work was performed by a non-union contractor pursuant to an easement.

Ultimately, the BTC decided not to pursue either violation.  In 2011, after inquiring about Verizon performing work near the Johnson Museum, Mr. Marsh was told by Cornell that Verizon was performing the work pursuant to an existing easement.  Similarly, in 2015 after filing a grievance, Mr. Marsh was told by Cornell that the construction was being performed pursuant to an existing easement.  *See* Co. Ex. 5.

Unlike the case here, Mr. Marsh was not provided the easements when he was informed that the work was being performed pursuant to easements in either 2011 or 2015. Instead, he took Cornell at its word that an easement existed and assumed that the work was properly being performed because the easements predated the first collective bargaining agreement between Cornell and the BTC.  Mr. Marsh did not have any idea how easements worked legally, but he did not assume the easements were granted *after* the BTC had an exclusivity agreement with Cornell as had been done in this case.  Mr. Marsh testified that if he had known that Cornell recently granted the easement in 2011 and 2015 which authorized construction being performed by a non-union contractor and that is within the BTC's jurisdiction, he would have filed a grievance in 2011, and advanced the grievance in 2015, both to arbitration.

**ARGUMENT**

The Agreement provides the BTC with exclusive jurisdiction over the construction and repair of utilities at Cornell University in Ithaca, New York.  Nothing in the Agreement indicates that the parties intended to exclude work performed pursuant to an easement; nor is there

anything inherent in the legal definition of an easement that compels work that is performed under an easement to be excluded from the BTC's exclusivity: Cornell voluntarily negotiated the terms through which its property was improved pursuant to the easement with NYSEG. Moreover, to the extent Cornell believes a past practice exists, it is mistaken.  A past practice cannot overturn clear and unambiguous contractual language.  Regardless, Cornell cannot establish that a past practice exists based on the two prior instances as it failed to show it was unequivocal, clearly enunciated and acted upon and readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both parties.  Not only does the Agreement explicitly forbid finding precedent based on the settlement of past grievances, but those matters arose under a different set of factual circumstances.

Accordingly, the Arbitrator must sustain the grievance.

### POINT I

### CORNELL VIOLATED BTC'S UNAMBIGUOUS EXCLUSIVE JURISDICTION

The general approach to contract interpretation is to look first to the specific terms of the parties' agreement to ascertain whether they resolve the issue at hand.  If they do, the arbitrator has no choice but to apply the terms as written.  *Denver Newspaper Agency*, 121 LA 44, 49-50 (2005).  Under the "plain meaning rule," an arbitrator cannot "ignore clear-cut contractual language," and an arbitrator also "may not legislate new language since to do so would usurp the role of the labor organization and employer."  *Clean Coverall Supply Co.*, 47 LA 272, 277 (1966). The Elkouris' highly-regarded treatise describes the rule:

> The well-established majority view remains that the existence of
> an ambiguity must be determined from the "four corners of the
> instrument" without resort to extrinsic evidence of any kind. This
> is the so-called "plain meaning rule," which states that if the

> words are plain and clear, conveying a distinct idea, there is no
> occasion to resort to interpretation, and their meaning is to be
> derived entirely from the nature of the language used.

Elkouri & Elkouri, How Arbitration Works (7th ed. 2012) (footnotes omitted).  Thus, arbitrators

first look to the wording of the contract to determine its meaning rather than alternative means

of contract interpretation such as a past practice.  Only if the language in the collective

bargaining agreement is ambiguous does an arbitrator analyze whether a past practice exists.

> Here, BTC submits that the language in the Agreement controls the current
> dispute and it is unambiguous.  The Agreement grants BTC exclusive jurisdiction
> over the construction and repair of utilities at Cornell University, with no
> exception for work done pursuant to an easement.

1.   _The Clear Language of the Agreement Establishes That Constructing a Gas
     Pipeline on University Avenue is in BTC's Jurisdiction_

BTC's exclusive jurisdiction applies to the construction and repair of "utilities" at Cornell

University.  Specifically, the Agreement is "effective at Cornell University in Ithaca, New York,

and shall include the University facilities in Tompkins County, New York, and cover craft

maintenance performed at the University."  Because the construction of a gas pipeline on

University Avenue is the construction of a utility at Cornell University in Ithaca, New York, the

parties have agreed that the work is unambiguously within the BTC's exclusive jurisdiction.

At the arbitration hearing, and notwithstanding the unrefuted testimony that the work

involved a utility, Cornell contended that the BTC's exclusivity did not apply because a gas

pipeline on University Avenue is not a "University facilit[y]" within the meaning of the

Agreement.  As explained below, Cornell is completely mistaken.

First, under the Agreement, the BTC's exclusivity is effective (1) _at_ Cornell University in

Ithaca, New York, _and_ (2) _shall include_ University facilities in Tompkins County.  The plain

meaning of that clause shows two separate and distinct areas where BTC's exclusivity is effective.  There is clearly no limitation to "University facilities" when the work is performed at and on Cornell's campus in Ithaca, New York.  The second clause is meant to expand on the first when work is not on Cornell's campus; in addition to all of Cornell's campus, the BTC's exclusivity *also* applies throughout Tompkins County, provided the work is being performed at or on a University facility.  There is no sensible reading that the second clause limits the first, as Cornell strains to argue.

Indeed, Cornell's "unique" interpretation would render the first clause entirely superfluous.  If exclusivity only applied to "University facilities in Tompkins County," then there would be no need to state that it *also* applies to the University's facilities at Cornell.  "It is axiomatic in contract construction that an interpretation that tends to nullify or render meaningless any part of the contract should be avoided because of the general presumption that the parties do not carefully write into a solemnly negotiated agreement words intended to have no effect." *John Deere Tractor Co.*, 5 LA 631, 632 (1946); *see also Russell, Burdsall & Ward Corp.*, 84 LA 373 (1985).  Thus, because the exclusivity clause is effective throughout Cornell University's Ithaca campus, it unambiguously covered the gas pipeline on University Avenue, which is on Cornell's campus, regardless of whether the area itself is considered a University facility or not.

Second, the gas pipeline is, nonetheless, a "University facilit[y]."  Cornell owns it.  It provides gas power to Cornell.  While the easement limits Cornell's rights with respect to what it can and cannot do to the gas pipeline, it does not convey ownership to NYSEG.  Any definition of "University facilities" must include infrastructure owned by and operated for Cornell.  Cornell

provided no testimony to offer a different interpretation other than the plain meaning of the contract term.  Further, there is simply no contractual language to indicate that work done pursuant to an easement is excluded by the Agreement.

Moreover, it is clear that the work performed, installing a gas pipeline and subsequent work associated with that, is BTC bargaining unit work.  As President Bruer and Mr. Williamee's uncontroverted testimony established, DDS performed bargaining unit work when it installed the pipeline.  Digging a ditch, installing and fusing a gas pipeline, filling the ditch, and then repairing the sidewalk is clearly bargaining unit work.  Digging and flagging is work that should have been performed by the laborers.  Sidewalk repair should have been performed by the masons.  Finally, the installation of the gas pipeline should have been performed by the pipefitters.  The Agreement dictates that this work is the exclusive jurisdiction of the BTC.

Hence, because the work falls under the Union's exclusive jurisdiction on Cornell's campus, the grievance must be sustained.

    2.    <u>*The Easement Does Not Excuse Cornell From Abiding by the Agreement*</u>

Cornell argues that its easement with NYSEG allows it to breach the exclusivity granted to the BTC under the Agreement.  As explained below, however, there is nothing unique about an easement that would authorize it to breach Cornell's collective bargaining obligations, or any other contract that Cornell may have for that matter.  Cornell still owns the property, and the construction was performed on a utility because Cornell chose to improve its Campus and properties.  Cornell could have conditioned the easement on the compliance with its existing contractual obligations, or have negotiated with the BTC on the use of easements on terms that the BTC could live with pursuant to a memorandum of agreement.  It could not, however, use

and permit non-union contractors to perform bargaining unit work on Cornell's campus in violation of the Agreement as it did here.

An easement is a right to some benefit, enjoyment or lawful use of another person's land. *Trustees of Town of Southampton v Jessup*, 162 N.Y. 122, 126 (1900). An easement allows use of the property, but does not transfer the ownership of the property. The easement holder has a real property interest in the "burdened" land. The easement holder, accordingly, possesses rights that are stronger than a license because it is a nonrevocable real property interest, but that are weaker than a fee interest because ownership of the property is not transferred.

An express easement—one created by written instrument—specifically outlines the rights in the property that the easement holder receives. *See Raven Indus., Inc. v Irvine*, 40 A.D.3d 1241, 1242 (3d Dept. 2007) ("The extent and nature of an easement must be determined by the language contained in the grant, aided where necessary by any circumstances tending to manifest the intent of the parties"); *Somers v. Shatz*, 22 A.D.3d 565, 566 (2nd Dept. 2005) ("The extent of an easement is limited by the language of the grant").

Cornell's easement that was provided to NYSEG conveyed the right to "install, construct, reconstruct, extend, operate, inspect, maintain, repair, replace, and at its pleasure, remove an underground gas pipeline." In exchange for seceding a real property interest over a section of University Avenue, Cornell received $0 from NYSEG. Hence, because Cornell still owns the land on Cornell's campus, the easement does not negate Cornell's contractual obligation.

Although Cornell maintains ownership over the land, it relinquished for free its right to use its property in any way that would interfere with NYSEG's ability to construct and operate a

gas pipeline.  Instead of receiving money for the real property interest it transferred to NYSEG, Cornell received a gas pipeline on its property.  Cornell burdened its land with a third-party's real property interest solely because of the accompanying benefit.  Indeed, the testimony clearly established that Cornell benefitted from the construction.  As Mr. Addy testified, there is now a 1400 foot gas pipeline on Cornell's property, which will be used to provide natural gas to Cornell-owned property along University Avenue.  Mr. Williamee further testified that the gas pipeline was already providing access to natural gas to one house, and was installed in order to hook up to the other properties along University Avenue.  Although it was unclear whether Cornell owned all of the properties abutting University Avenue, it is undisputed that they own at least some of these properties that can now be hooked up to the gas pipeline.

3. _Cornell Could Have Granted NYSEG an Easement and Complied With the Agreement_

An express easement is a flexible tool, designed to transfer specific and defined rights in real property from the owner to another party.  Cornell could have granted NYSEG an easement which was limited to the use of a workforce that complied with Cornell's contractual obligations under the Agreement, but it did not do so.  For example, the easement did not grant NYSEG an unrestricted right to construct and operate a gas pipeline; it was limited by rights Cornell preserved through negotiations.  Specifically, Cornell preserved the right to:

1. access and excavate within and otherwise use said easement area in order to install, maintain, repair and replace any of Cornell's utilities located within the easement, subject to notice to NYSEG;

2. work within the easement area without notice in cases of emergency posing an immediate threat to life, safety or property;

3. maintain existing mature trees and vegetation;

4.      cultivate the ground; and

5.      cross and recross said easement and right of way.

Cornell and NYSEG further agreed to work in good faith to move the location of the easement, upon the request of Cornell.

Jeremy Thomas, senior director of real estate at Cornell, testified to the process through which Cornell engages in before agreeing to an easement.  He testified that Cornell enters into approximately one or two easements per year, but made no mention of whether or not any of these other easements resulted in non-union contractors performing bargaining unit work. Importantly, he testified that when an easement is requested, it is negotiated with the third party and undergoes revisions before it is agreed to.  Here, the easement at issue that was provided to NYSEG, in fact, had revisions.  *See* Jt. Exh. 7.

Easements are regularly subject to whatever restrictions the parties decide.  For example, in *Acad. of Med. of Queens Cty. v. Seminole 75 Realty Corp.*, 832 N.Y.S.2d 286 (2d Dept. 2007), the defendant had granted an easement to the plaintiff for the right to use certain parking spaces for free.  The easement, however, maintained for the grantor/defendant the right to issue "reasonable rules and regulations" for the parking spaces.  The court found that an enforceable easement existed and was subject to the reasonable rules and regulations grantor/defendant promulgated.  Although grantor/defendant transferred a real interest in the property to plaintiff in the form of an easement, he reserved certain rights for himself, which the court found enforceable.  Pursuant to the easement, the court then analyzed the rules and regulations for reasonableness and found some of them reasonable and others unreasonable. *See also Morgan v. Bolsan Realty Corp.*, 369 N.Y.S.2d 544, 546 (3d Dept. 1975) ("A grantor of an

easement may convey or retain that which he desires.  In other words he may create an extensive or a limited easement").

Similarly, here, Cornell unquestionably had the ability to grant a right in the property limited to construction that would be consistent with its obligations under the Agreement.  To the extent that Mr. Thomas stated that such an easement is not enforceable because it conflicts with his understanding of the purpose of the easement, he is completely wrong.  Mr. Thomas, who is not a lawyer, understandably conflated the ability of Cornell to use its remaining rights on the now-burdened property at issue here after the easement was entered into, with its ability to define the rights it would transfer prior to them being transferred.  Of course, after an easement exists, the grantor cannot take actions that interfere with the easement holder's use of the easement.  But Mr. Thomas is wrong that the easement itself cannot define the rights and obligations of the grantor and easement holder *prior* to the easement being granted.

Notably, Cornell's obligations and legal duties over property which it owns are not extinguished by transferring certain rights over the land in an easement.  Because Cornell retains ownership of the land, it still has legal duties related to the land.  For example, in *Murray v. Lancaster Motorsports, Inc.*, 812 N.Y.S.2d 726 (4th Dept. 2006), the court held the "burdened" landowner liable for a violation of New York Labor Law.  The plaintiff was injured by a wire that was subject to an easement by NYSEG.  Nonetheless, the court found that "the fact that their property was subject to an easement … does not relieve them of their nondelegable duty to decedent under the Labor Law."  *Id.*; *see also Tagle v. Jakob*, 97 N.Y.2d 165, 169 (2001) (noting that a landlord has a duty to warn of dangers presented by a wire, even though the wires were installed by NYSEG pursuant to an easement).

In this case, Cornell agreed in the parties' Agreement that work done at Cornell on utilities was within the exclusive jurisdiction of the BTC.  This contractual legal duty still exists regardless of the easement.  Cornell has an independent contractual duty to the BTC that is unaffected by the use of an easement.  To the extent that Cornell wanted, or even believed it needed to grant NYSEG an easement, Cornell does not get a free pass to breach the Agreement when it does so.

The parties agreed that BTC has the right to exclusively perform the construction of utilities at Cornell.  There is no exception in the Agreement for work performed pursuant to an easement, and there is no reason for the Arbitrator to provide one that was never bargained.  This would amount to the Arbitrator adding a provision to the Agreement where none exists.  The fact is Cornell chose to improve its property through the construction and installation of a gas utility.  Cornell chose to accomplish this through an easement with NYSEG.  And, finally, Cornell chose to grant NYSEG the right to install the pipeline with non-union labor.  Simply put, Cornell chose not to comply with the Agreement when it entered into the easement.  It should not be rewarded for its poor planning and decision-making where there was a clear breach of the Agreement.[4]

Thus, the grievance must be sustained.

---

[4]Cornell chose to do all of this without negotiating with the Union. President Bruer testified that he would not have filed a grievance if NYSEG had self-performed the work using IBEW 10 members notwithstanding the fact that the Agreement forbids *any* subcontracting to contractors that are not signatory to one of the unions that are signatory to the Agreement.  Cornell could have negotiated with the Union that NYSEG's employees would perform the work and then conditioned the easement on NYSEG's IBEW-represented employees performing the work, rather than DDS or another non-union contractor.  Of course, these are not the facts.  Union members did not perform the work, but instead non-union employees of DDS did.  Cornell has made it quite clear that it was not interested in reaching a compromise on this this issue at the time it entered into the easement and going forward given its decision to arbitrate this matter rather than reach a settlement going forward.

**POINT II**

**NO PAST PRACTICE EXISTS WITH RESPECT TO EASEMENTS**

The Union believes that this is a clear case of contract interpretation.  Cornell argues that a past practice exists which would enable it to rewrite the clear language to its favor.  It is mistaken.  As explained in detail below, the grievance must be sustained.

In order to establish a past practice, the proponent must demonstrate that it was unequivocal, clearly enunciated and acted upon and readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both parties.  *Celanese Corp. of Am.*, 24 LA 168, 172 (1954).

Here, Cornell argues that a past practice exists because of two instances where bargaining unit work was performed by non-union contractors under an easement that had been granted.  First, Cornell's past practice defense fails because a past practice cannot override clear contractual language.  Second, two instances, one in 2011 and one in 2015, hardly amount to a situation where a non-union contractor is on campus all day, every day for a consistent period, such that the BTC accepted the encroachment on its work jurisdiction when easements are involved.  Even if we were to believe non-union contractors had performed work pursuant to easements on more than these two occasions, which Cornell neither argued nor presented any evidence thereof, the evidence establishes that the BTC objected every time it had notice.  Simply put, Cornell has failed to demonstrate that its use of easements which led to bargaining unit work being performed by non-union contractors was unequivocal, clearly enunciated and acted upon and readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by *both* parties.

{B0320851.1}                                        18

Importantly, there is no evidence that when these two disputes were addressed by the BTC that it agreed with Cornell's interpretation of the Agreement.  Instead, former President Marsh testified that Cornell treated this current grievance differently than the two previous grievances that he withdrew.  Quite clearly, the circumstances surrounding those grievances cannot establish a past practice.  When Mr. Marsh objected in 2011 and filed the grievance in 2015, Cornell stated that the work was being performed pursuant to existing easements. Cornell did not provide Mr. Marsh with a copy of the easements, as Cornell did here.  Mr. Marsh testified that he understood Cornell to mean that the easement rights the third-party possessed preceded the BTC's original exclusivity agreement with Cornell over 40 years prior. Mr. Marsh did not assume, perhaps naively, that Cornell would so blatantly violate the BTC's exclusive jurisdiction, as it did here.  Accordingly, he did not pursue the matters believing that these pre-existing easements in essence "trumped" the Agreement the BTC had with Cornell.

Here, in this case, Cornell provided the easement when it denied the grievance. Accordingly, the BTC believed this case was different than the other times it had discussed easements with Cornell.  The BTC saw that the easement was granted to NYSEG immediately before DDS performed the construction work.  Rather than dealing with what it thought might be a third-party's longstanding rights on Cornell property, which predated the Agreement, the granting of a new easement in order to immediately install a gas pipeline appeared substantively different.  Hence, the usage of easements to circumvent the Union's exclusivity was not a long-standing practice which the BTC had accepted.[5]

---

[5] Of course, Mr. Marsh may have been wrong about the easements at issue in the 2011 and 2015 grievances, but that is of no significance and Cornell did not rebut Mr. Marsh's interpretation by introducing these easements.  Mr.

Further, any claim that the BTC's abandonment of the 2011 issue and 2015 grievance somehow established a precedent or practice that permits DDS to perform this work is in direct conflict with the Agreement and arbitral precedent.  The parties' collective bargaining agreement determines what grievance resolutions, if any, are to be considered "final and binding."  *See, e.g.*, *Gen. Drivers, W. & H. v. Riss & Co.*, 372 U.S. 517, 520 (1963).  Here, the parties' Agreement expressly and unambiguously provides the following:

- Grievance settlements shall not establish a precedent or practice for either party unless mutually agreed upon.

- The Union may withdraw a grievance at any step without prejudice or precedence.

- … Whenever the Union fails to meet the time limits required in the grievance procedure, the grievance shall be regarded as settled on the basis of the University's last response or position. …

Jt. Exh. 1 at 7.

Under the plain language of the Agreement, the Arbitrator may not treat the uncompleted 2011 inquiry and 2015 grievance as having established any precedent or practice. By not pursuing the 2011 matter or the 2015 grievance to arbitration, the BTC "withdrew" them.  Under the Agreement, it explicitly did so "without prejudice or precedence."  It retained the right to remedy any subsequent violations, should they occur.

Even if the BTC simply "fail[ed] to meet the time limits" by allowing the 2011 issue and 2015 grievance to lapse, the Contract makes clear that no precedent or practice was established, and that Cornell is not entitled to rely on lapsed grievances as binding on future

---

Marsh testified that he would have pursued the grievances if he had known they were granted while BTC had an exclusivity agreement with Cornell.

grievances.  The Contract provides that if the BTC misses a time limit, it "settle[s]" the grievance on Cornell's terms—but "settlements shall not establish a precedent or practice for either party unless mutually agreed upon."  Jt. Exh. 1 at 7.  In other words, unlike arbitration awards, settlements resolve the dispute over the particular event or instance involved *without* governing other events that may arise in the future under the clear wording of the Agreement. Cornell cannot point to anything that suggests the parties "mutually agreed" to establish a precedent and different understanding of the Agreement, and Marsh's testimony clearly established that they did *not.*  Cornell simply rebuffed the 2011 issue and denied the 2015 grievance and the BTC chose not to contest them further.  The BTC did *not* agree that Cornell could, from then on, ignore the Agreement and allow DDS or any other non-union contractor to perform bargaining unit work whenever a non-union contractor was granted an easement on campus.

Importantly, the parties' Agreement is in line with the general principle that a settlement or withdrawal of a claimed contract violation does not establish a past practice. *E.g.*, *Exide Corp.*, 98 LA 626 (1992) ("The Union filed a grievance in the past but settled, so the Employer's past practice argument that the Union accepted the Employer's interpretation is not correct.").  "The prospective significance of a withdrawn grievance is speculative at best."  *Color Art Printing*, 2003 BNA LA Supp. 110083 (2003).  The 2011 inquiry and 2015 grievance show that the Union has consistently opposed any claim that non-union contractors can perform work simply because Cornell has given up an easement.  Any assertion that the Union established a "past practice" of allowing this by choosing not to pursue those two particular issues to arbitration, is therefore wholly without merit.  Thus, because there is no evidence in

the record that the Union agreed to Cornell's position in 2011, 2015 or at any other time

thereafter, Cornell has not established a binding past practice which overrides the clear

wording of the Agreement.

Accordingly, Cornell's past practice defense fails and the grievance must be sustained.

## <u>CONCLUSION</u>

Cornell violated Article 1 of the Agreement because DDS, a non-union contractor, performed bargaining unit work at Cornell.  The fact that the work was done pursuant to an easement is irrelevant to whether or not the Agreement states that it was within BTC's exclusive jurisdiction.  An easement does not transfer property; instead, it allowed Cornell to improve its property while maintaining ownership.  An easement does not allow Cornell to ignore its clearly stated contractual obligations.  Cornell could have conditioned the easement on compliance with the Agreement but it chose not to do so.[6]  The BTC members that should have performed the work must be made whole.  Cornell must cease and desist from entering into any future easements which authorize non-union contractors to perform bargaining unit work.  The Arbitrator must retain jurisdiction with respect to any and all disputes about the make whole remedy.

DATED:  April 28, 2023                    Respectfully submitted,

                                          BLITMAN & KING LLP

                        By:    _____

                                          Nathaniel G. Lambright
                                          F. Wesley Turner
                                          *Attorneys for Tompkins-Cortland*
                                          *Building & Construction Trades Council*
                                          Office and Post Address
                                          Franklin Center, Suite 300
                                          443 N. Franklin Street
                                          Syracuse, New York  13204
                                          Telephone:  (315) 422-7111
                                          Facsimile:  (315) 471-2623

---

[6] Alternatively, Cornell could have negotiated directly with BTC for an exception to its exclusive jurisdiction should the easement guarantee that NYSEG use its Union labor workforce, as opposed to DDS or another non-union contractor.  It did not do this either.

{B0320851.1}                              23